Irby *v.* Irby.

E. R. IRBY *et al.* v. W. E. IRBY *et al.*

1. CHANCERY PLEADINGS AND PRACTICE. *Sale of real estate. Value.* The only test of the value of property at a forced sale is what it will bring.

2. SAME. *Same. Title.* When the sale of property is forced, the court has no power to give a bidder assurance of a good title, and proffer to bid on the terms of such assurance cannot be entertained.

3. SAME. *Same. Clerk and master. Terms of sale.* The master, in executing an order of sale, may demand an immediate compliance by a purchaser with the terms of sale, when he has reason to doubt the good faith of a bidder.

4. SAME. *Same. Biddings re-opened. Advance bid.* After the biddings at a master's sale have once been opened and a public resale had, the court may well, upon another offer of an advance of ten per cent, confirm the sale to the reported bidder with his consent at the new advance.

FROM SHELBY.

Appeal from the Chancery Court at Memphis. W. W. McDOWELL, Ch.

W. M. RANDOLPH for complainants.

HUMES & POSTON for defendants.

COOPER, J., delivered the opinion of the court.

Bill filed November 24, 1873, by E. R. Irby as administratrix of the estate of E. Irby, deceased, against the heirs and creditors of the intestate, upon suggestion of insolvency, to sell the lands descended for the payment of debts. The present appeal is by the heirs from a decree confirming the sale of the lands. There is no question as to the propriety of the decree of sale. The only contest is whether the sale reported should have been confirmed.

A sale of the lands had once been made under the decrees of the court, which was set aside by the court, because, as the order states, it was impossible to locate or designate the lands. A new survey was ordered and made, and the court directed the land to be sold for one-third cash, and the balance of the purchase money in one and two years, the purchaser to give notes with good security, etc. This order was made on January 21, 1881. From this decree, which was only a renewal of the former decree of sale, no appeal could have been taken even with the consent of the court. But first one, and then another party appears to have asked for an appeal, which seems to have been granted, set aside, granted again, and again set aside as if his Honor desired to accommodate all parties as they severally applied to him. However, in the end, before the close of the term, all the orders granting

appeals were set aside, and the prayers for appeal refused.

On March, 26, 1881, the clerk and master sold the land as ordered. At this sale Busby and Andrews purchased two lots at the price of $391, and nine other purchasers bought one or more lots each, their aggregate bids being $1,062.50. Busby and Andrews thereupon advanced ten per cent on these latter bids, and complied with the terms of sale. The clerk and master reported the facts, his report bearing date June 29, 1881. The administratrix and heirs filed exceptions as follows : 1. The price was inadequate; 2. The sale was appealed from, the rights of parties complicated, and bidders deterred; 3. The advance made was without any order of court, and the biddings should be opened generally. The chancellor, by decree of August 9, 1881, ordered the biddings to be opened as to the lots on which advances had been made, and kept open until the first Monday in September, when they should be closed; and the master was then directed to advertise the land for sale at public vendue, beginning the sale of each lot at the highest bid then made and complied with, and if no advance be made on the bids of Busby and Andrews, then at their bid as already complied with.

Under this order, on October 8, 1881, the master again offered the lands at public sale. At this sale, one W. S. Hubbard was the principal bidder. The master, upon a suggestion that Hubbard was a straw bidder, publicly announced that he would require the terms of the sale to be complied with by four o'clock,

it being then between two and three o'clock, other-
wise he would resell the property at once.   Hub-
bard bid off the lots at the aggregate price of
$2,780, but, after some effort, announced that he would.
be unable to comply with the terms of sale until the
succeeding Monday.   The master, thereupon, said that
he would proceed to resell, but if Hubbard remained
the highest bidder, and should comply with the terms
of sale according to his promise, or at any time before
a confirmation of the sale, his bid would be accepted.
With this statement, and a complete understanding on
the part of all concerned, the master again put up the
lots, and they were struck off to Busby and Andrews
at an advance on their former bid of one dollar a
lot.    On October 10, 1881, the master filed his report
of the sale, stating these facts.    Exceptions were filed
on the 17th of that month to the report, the first
two being the same as the first two exceptions to the
former report.    The third exception was, that the
prices offered by Hubbard were much higher than
those of the persons to whom the lots were sold, and
there was no evidence that he was acting in bad
faith.    The fourth exception was that by the usage of
the master's office, and by law, a purchaser had a
reasonable time to comply with the terms of sale, and
Hubbard was not allowed such time.    Affidavits were
filed tending to show that Hubbard was employed by
E. T. Irby and B. F. Adams to bid off the land for
them.    The first of these gentlemen says in his affi-
davit that he is able, willing and ready to bid a
much higher price than Busby has given if he is

permitted to do so, "and can at the same time be assured of acquiring a good title to the property under his purchase." The last says: "I would have complied with the terms of sale if I had been satisfied that I would have gotten a good title." These affidavits were made on the 10th and 13th of January, 1882, respectively.

The cause was heard January 13, 1882, upon the master's report of June 29, and October 10, 1881, the exceptions thereto, and the objections based on the affidavits, and the reports confirmed. Two days afterwards, one A. M. Boyd presented a petition for the opening of the biddings upon an offer by him of an advance of ten per cent on the bids of Busby and Andrews. The chancellor required these gentlemen to increase their bid to the amount thus offered, which they did under protest, and then again confirmed the sale at the advance. The heirs of the intestate alone appeal.

It will be seen from the foregoing statement of facts that there is no contest among bidders. Boyd acquiesces in the decree, and neither Hubbard, nor those for whom he acted as agent, ever offered to comply with his bid, although, under the announcement and agreement of the clerk on the day of sale, they had from October 8, 1881, to January 13, 1882, to do so. On the contrary, both Irby and Adams plainly say in their affidavits that they would not comply unless "assured of acquiring a good title." But the sale being for the benefit of creditors, and *in invitum,* the court had no power to give any such

assurance: *Hously* v. *Lindsay*, 10 Heis., 651; *Staun-ton* v. *Harris*, 9 Heis., 579; *Foster* v. *Bradford*, 1 Tenn. Ch., 400. And an application to open biddings, based upon a condition that cannot be complied with, should not be entertained: *Lucas* v. *Moore*, 2 Lea, 1. The only question therefore is whether the sale as made was properly confirmed.

The sale of June 29, 1881, was entirely unexceptionable in the manner in which it was conducted, and the lots in controversy were then sold to nine different bidders for only $1,062. It is, of course, no valid ground of exception to a master's sale that the prices obtained were inadequate. The only test of value at a forced sale is what the property will bring. And the best possible assurance that the bids were a near approximation to the actual value is that none of the original puchasers cared to increase their bids, and the heirs refuse to take the property at all except upon an impossible condition. There was no appeal from the original decree of sale, nor any right of appeal at the time when appeals were prayed and eventually refused. It is very certain that Hubbard's bids were a mere pretense, for the parties at whose instance they were made could have complied at any time within three months. There can be no doubt of the master's authority to demand an immediate compliance with the terms of sale where he has any reason to doubt the good faith of the bidder; for otherwise new advertisements, and new 'sales would have to be made indefinitely. The conduct of the master in the case before us was entirely correct and

proper. He carried out the order of the court, and yet left to the apparent bidder ample opportunity to comply with his offer, and have the facts reported to the court. There is nothing, therefore, in any of the exceptions to the report. The biddings having been once opened with ample time given to all parties to make advances, and the property afterwards exposed at public sale, it was clearly a matter resting in the sound discretion of the court whether further time should be allowed or the sales closed: *Dupuy* v. *Gorman,* 9 Lea, 144. The creditors of the estate, and the actual bidders had rights which it was the duty of the court to respect, whether the heirs of the intestate were satisfied or not: *Mabry* v. *Churchwell,* 9 Lea, 488. The chancellor did right in confirming the sale at once at the final advance: *Morton* v. *Sloan,* 11 Hum., 279.

Affirm the decree with costs of this court to be paid by the appellants, and the cause will be remanded for further proceedings.